MATTHEW J. ADLER (SBN 273147)
Matthew.Adler@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
Four Embarcadero Center, 27th Floor
San Francisco, California 94111-4180
Telephone:    415-591-7500
Facsimile:    415-591-7510

JEFFREY S. JACOBSON (*pro hac vice*)
Jeffrey.Jacobson@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas, 41st Floor
New York, New York  10036-2714
Telephone:    212-248-3140
Facsimile:    212-248-3141

RYAN M. SALZMAN (SBN 299923)
Ryan.Salzman@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1500
Los Angeles, California  90067-1517
Telephone:    310-203-4000
Facsimile:    310-229-1285

Attorneys for Defendant
EPIC GAMES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| C.W., a minor, by and through his Guardian, REBECCA WHITE, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EPIC GAMES, INC., a North Carolina corporation,<br><br>Defendant. | Case No. 4:19-cv-3629-YGR<br><br>**DEFENDANT EPIC GAMES, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Date:         May 19, 2020<br>Time:        2:00 p.m.<br>Courtroom: 1<br>Judge:       Hon. Yvonne Gonzalez Rogers<br><br>Action Filed: June 21, 2019<br>Trial Date:   None set |

FAEGRE DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

EPIC GAMES, INC.'S REPLY IN SUPPORT OF
MOTION TO DISMISS AMENDED COMPLAINT

CASE NO. 4:19-CV-3629-YGR

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................... 1
ARGUMENT .................................................................................................................................. 1
    A.    The Court Should Dismiss Plaintiffs' Claims for Declaratory Relief and for Violation of the Unfair Competition Law's "Unlawful" Prong. ............................ 1
        1.    Plaintiffs' Disaffirmation Claim Against Epic Games Fails Because It Is Premised on C.W.'s Transactions Using Apple and Sony Gift Cards. ......................................................................................................... 6
        2.    C.W. Cannot Disaffirm In-Game Purchases of V-Bucks Charged to His Parent's Credit Accounts. ......................................................................... 8
    B.    The Court Should Again Dismiss Plaintiffs' Fraud-Based Claims. ...................... 11
        1.    Digital In-Game Items Are Not CLRA-Defined "Goods" or "Services." ................................................................................................. 11
        2.    Plaintiffs' UCL and Negligent Misrepresentation Claims Fail Because Epic Games Does Not "Mislead" Players About the Ability to Disaffirm Contracts. .............................................................. 12
    C.    Plaintiffs Fail to Adequately Plead a Breach of the Implied Duty of Good Faith. .................................................................................................................... 14
    D.    Plaintiffs' Unjust Enrichment Claim Fails as a Matter of Law. ............................ 15
CONCLUSION ............................................................................................................................. 15

FAEGRE DRINKER
BIDDLE & REATH LLP
ATTORNEYS AT LAW
NEW YORK

EPIC GAMES, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

- i -

CASE NO. 4:19-CV-3629-YGR

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Anderson v. Seaworld Parks and Ent'mt, Inc.*,
   No. 15-cv-2172-JSW, 2016 WL 8929295 (N.D. Cal. Nov. 7, 2016) ..................................... 12

*Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*,
   2 Cal. 4th 342 (1992) .......................................................................................................... 14

*Grube v. Amazon.com, Inc.*,
   No. 16-cv-126-LM, 2017 WL 3917602 (D.N.H. Sept. 6, 2017) ........................................... 10

*I.B. v. Facebook, Inc.*,
   905 F. Supp. 2d 989 (N.D. Cal. 2012) ............................................................................ 4, 12

*Ileto v. Glock Inc.*,
   349 F.3d 1191 (9th Cir. 2003) ............................................................................................. 11

*McNamara v. Voltage Pay Inc.*,
   No. 2:15-cv-2177-JAD-GWF, 2017 WL 3709057 (D. Nev. Aug. 28, 2017) .......................... 7

*Morrow v. Norwegian Cruise Line Ltd.*,
   262 F. Supp. 2d 474 (M.D. Pa. 2002) ................................................................................. 10

*Paster v. Putney Student Travel, Inc.*,
   No. CV 99-2062 RSWL, 1999 WL 1074120 (C.D. Cal. June 9, 1999) ............................... 10

*R.A. v. Epic Games, Inc.*,
   No. 5:19-cv-325-BO, 2020 WL 865420 (E.D.N.C. Feb. 20, 2020) ........................................ 5

*T.K. v. Adobe Sys., Inc.*,
   No. 17-CV-4595-LHK, 2018 WL 1812200 (N.D. Cal. Apr. 17, 2018) ....................... 4, 12, 14

*White v. Hollister Co.*,
   No. B239119, 2013 WL 30361 (Cal. Ct. App. Jan. 3, 2013) .................................................. 7

**STATUTES, RULES & REGULATIONS**

Cal. Bus. & Prof. Code § 17200 ................................................................................................... 1

Cal. Civ. Code § 1749.5 ............................................................................................................... 7

Cal. Civ. Code § 1749.5(b) ........................................................................................................... 6

Cal. Fam. Code § 6710 ................................................................................................... 1, 10, 13

FAEGRE DRINKER BIDDLE
& REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

EPIC GAMES, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

- ii -

CASE NO. 4:19-CV-3629-YGR

# INTRODUCTION

Plaintiffs' original complaint sought to declare minor plaintiff C.W.'s purported right, pursuant to Cal. Fam. Code § 6710, to disaffirm purchases he alleged he made from defendant Epic Games, Inc. ("Epic Games") with his "own money." Plaintiffs' First Amended Complaint ("FAC") and their opposition to dismissal of that FAC (the "Opp," Dkt. No. 61), confirm that C.W. **did not** make any purchases from Epic Games with his "own money." Plaintiffs' *new* claims pertain instead to (1) C.W.'s redemption of third-party gift cards on third-party marketplaces, which were not transactions with Epic Games; (2) C.W.'s authorized use of his mother's credit card to charge purchases from Epic Games, which Mrs. White paid for without dispute; and (3) other purchases charged to Mrs. White's credit card, purportedly by C.W.'s friends, not C.W., and which Mrs. White also paid without dispute. C.W. has no legal right to disaffirm any of these transactions.

In ruling upon Epic Games' motion to dismiss Plaintiffs' original complaint, the Court dismissed all of Plaintiffs' fraud-, negligence-, and contract-based claims. Plaintiffs' FAC and brief offer no valid arguments as to why the Court should restore any of those causes of action. The Court left intact only (1) Plaintiffs' declaratory judgment claim pertaining to the "own money" transactions with Epic Games that Plaintiffs now concede never existed; and (2) a claim that if Epic Games denied C.W. a statutory "right" to disaffirm contracts (which it could not have done because C.W. never transacted with Epic Games with his "own money") then Epic Games may have been liable under the "unlawful" prong of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. If the Court determines on this motion, as it should, that Cal. Fam. Code § 6710 does not allow C.W. to disaffirm to Epic Games purchases he made from other companies, to disaffirm purchases he made with his mother's credit card to which his mother gave him authorized access, or to disaffirm purchases C.W. claims were made by friends of his and not himself, then the Court should dismiss Plaintiffs' FAC in its entirety, without further leave to amend.

# ARGUMENT

**A. The Court Should Dismiss Plaintiffs' Claims for Declaratory Relief and for Violation of the Unfair Competition Law's "Unlawful" Prong.**

There can be no doubt that when the Court partially denied Epic Games' motion to dismiss Plaintiffs' original Complaint—leaving intact only claims for a declaratory judgment and violation

of the UCL's "unlawful" prong—it did so based upon Plaintiffs' now-withdrawn allegations that C.W. made in-game purchases from Epic Games "using **his own money**." Dkt. No. 54 at 28 (emphasis added). The Court construed Epic Games' position to be that it disputed C.W.'s right to disaffirm his "own money" transactions with the company, and the Court's ruling would have allowed Plaintiffs to pursue a declaratory judgment in this regard. To the extent Epic Games' purported refusal to allow C.W. to disaffirm a contract amounted to "unlawful" conduct, the Court also would have permitted Plaintiffs to pursue their claim under the UCL's "unlawful" prong. The Court's ruling stated repeatedly that it premised its decision on C.W.'s claim to have used his "own money" when transacting with Epic Games. *See id.* at 4 ("Plaintiff further alleges that he used his own money, through gift cards received on social occasions, to make these purchases."); *id.* at 17 n. 15 (C.W's "intent [is] to disaffirm in-App purchases allegedly made using [C.W.'s] own money."); *id.* at 28 ("Plaintiff's argument that minors do not have access to information about their purchase history is undermined by the fact that plaintiff's allegations in the case are based on in-App purchases he made using his own money.").

By the time the Court authorized Plaintiffs to amend their Complaint, discovery had progressed to the point where Plaintiffs no longer could assert, consistent with their Rule 11 obligations, that C.W. ever had transacted with Epic Games using his "own money." In the FAC, Plaintiffs still contend that C.W received "gift cards" on "social occasions," but they now clarify that these were Apple and Sony gift cards that could be redeemed only on those third parties' iTunes and PlayStation marketplaces. C.W. alleges that he chose to purchase *Fortnite* "V-Bucks" from those other companies, but Epic Games was not a party to those transactions in any respect. C.W.'s only transactions **with Epic Games** were purchases that he made using his mother's credit card, which Mrs. White admits in the FAC she allowed C.W. to use for these purchases.

Discovery also revealed that four different *Fortnite* player accounts were used to charge purchases to Mrs. White's credit card. The Internet Protocol addresses of these charges all match, showing that all of the charges were made from the Whites' residence. Plaintiffs, however, claim that C.W. himself played only in one *Fortnite* account. They claim that the other purchases charged to Mrs. White from the three other accounts were made by "friends" of C.W. Dkt. No. 60 at 2.

Because Plaintiffs no longer contend that C.W. made any purchases from Epic Games using his own money, they cannot assert entitlement to a declaratory judgment that C.W. may disaffirm such transactions or claim any relief under the UCL's "unlawful" prong. The *new* questions before the Court, raised for the first time by the FAC, are whether C.W. has (1) any claim against Epic Games with respect to his transactions with other companies (Apple and Sony) using those companies' site-specific gift cards; (2) a legal right to disaffirm direct transactions with Epic Games when he used his mother's credit card with her authorization; or (3) standing to disaffirm purchases that C.W. asserts were made by unnamed friends of his, not by C.W. himself. Epic Games submits that the answers to all of these questions, based on facts alleged in the FAC that the Court did not confront in the prior motion practice, should be "no," requiring dismissal of the FAC.

Plaintiffs' brief takes the false position that these are not "new" claims, that their suit always referenced "in-App Purchases charged directly to [Rebecca White's] bank account, credit card or debit card," and that the Court previously ruled on the sufficiency of these claims. Opp. at 4, *citing* Dkt. No. 1 ¶¶ 1, 33, 35. This is not true. The prior Complaint referred only to "use of minor's one or more gift cards," without confessing that C.W. only made gift card purchases from companies other than Epic Games. *Id.* ¶ 1. It stated that C.W. "made several in-App purchases" from Epic Games, but referred only to C.W.'s use of his "own money through gift cards received on social occasions" when transacting with Epic Games. *Id.* ¶¶ 33, 35. Plaintiffs said **nothing** about charges to Rebecca White's credit accounts, as the Court's prior opinion recognized. *See* Dkt. No. 54 at 17 n.15 ("The May 17 letter and the filing of this suit conveyed plaintiff's intent to disaffirm in-App purchases allegedly made using plaintiff's own money."). Nor did Plaintiffs' prior Complaint say anything about purchases supposedly made by C.W.'s "friends" using Mrs. White's credit card.

Plaintiffs' counsel stated in a declaration accompanying Plaintiffs' brief (Dkt. No. 61-1) that "Plaintiff served Defendant documents in this action about Minor Plaintiff C.W.'s in-App purchases, including details about dates and amounts spent for each transaction." This is not accurate, either. The only documents Plaintiffs produced are redacted credit card statements showing payments to Epic Games by Rebecca White, not C.W. *See* accompanying Reply Declaration of Jeffrey S. Jacobson ("Jacobson Declaration") ¶ 2 & Ex. A (DOE000012). Far from

acknowledging that these credit card statements reflect "C.W.'s in-App purchases," as Plaintiffs' counsel's declaration stated, Plaintiffs repeatedly have cast doubt on what they reflect and, in fact, have explicitly denied that at least some of these charges were C.W.'s at all. They advised the Court instead that these charges were made by C.W.'s unnamed "friends." Dkt. No. 60 at 2.

The statement attached as Exhibit A to the Jacobson Declaration shows a $24.99 charge from Epic Games on Nov. 30, 2018, and two $99.99 charges on Dec. 1, 2018. Only the $24.99 charge was made in the single *Fortnite* account that Plaintiffs have admitted C.W. used. *See* Dkt. No. 40 ("Plaintiff has complied with the Court Order and has provided to Defendant . . . Plaintiff's [single] Fortnite user Account ID."). The two $99.99 charges to Mrs. White's credit card—although made from the Whites' residence—were made through a **different** Fortnite player account that C.W. has told the Court is not his. *See* Dkt. No. 60-3, Ex. C at 3. Mrs. White's credit card was used to charge purchases from **four** separate *Fortnite* player accounts, all from inside the White's residence (*see id.* at 2-4), but Plaintiffs continue to insist that C.W. himself played only in one account. Plaintiffs contend that these other charges may have resulted from "C.W.'s friends playing from his house." Dkt. No. 60 at 2. If that is true, however, then those charges do not reflect "C.W.'s in-App purchases" at all. Plaintiffs make no attempt to explain how C.W. can disaffirm purchases he did not make, and Mrs. White has no standing to disaffirm transactions engaged in by C.W. or his friends. *See I.B. v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1004-05 (N.D. Cal. 2012).

This factual shell game highlights a fundamental problem that has existed in Plaintiffs' lawsuit from its outset. They have never clearly said what C.W. wishes to disaffirm, and under what authority. They did not identify themselves to Epic Games before suing or give Epic Games the ability to investigate their request and respond to it. In contrast, the plaintiffs in *T.K. v. Adobe Sys., Inc.*, No. 17-CV-4595-LHK, 2018 WL 1812200, at *13 (N.D. Cal. Apr. 17, 2018), and *I.B.*, 905 F. Supp. 2d at 996, sued only until after those defendants refused their attempts to disaffirm, and sued only over the contracts that they identified pre-suit and that the defendants refused to disaffirm. Plaintiffs here, however, sued without first asking to disaffirm or specifying what C.W. wanted to disaffirm. *See* Dkt. No. 59-2 (May 17, 2019 CLRA Notice). Even now, a year into the litigation, Plaintiffs still refuse to state exactly what C.W. is attempting to disaffirm. Meanwhile,

discovery has whittled away at Plaintiffs' claims to the point where C.W. has **no** transactions with Epic Games that he has any legal basis to disaffirm.

In another recent case involving purchases made from Epic Games (assertedly) by a minor, *R.A. v. Epic Games, Inc.*, No. 5:19-cv-325-BO, 2020 WL 865420 (E.D.N.C. Feb. 20, 2020), the minor plaintiff asserted various claims arising from his transactions but did not seek to disaffirm them. Epic Games moved to compel arbitration, or to transfer the case from California to North Carolina, pursuant to the same End User License Agreement ("EULA") that the Court ruled upon in this case. Only then did the *R.A.* plaintiff—in the midst of motion practice—assert his right to disaffirm every *Fortnite* EULA he had accepted. Epic Games accepted his disaffirmation and offered a refund for all purchases the plaintiff had made, arguing that the plaintiff could not disaffirm his contractual relationship with Epic Games while continuing to assert claims arising from the transactions his disaffirmation nullified. The court agreed and dismissed that plaintiff's case. "Plaintiff cannot void the transactions with defendant and receive his refund while simultaneously maintaining causes of action that arise solely from those transactions." *Id.* at *2.

For Plaintiffs to receive the same consideration from Epic Games with respect to C.W.'s asserted disaffirmation, they must at the very least tell a straight story about what C.W. is attempting to disaffirm, and on what basis. In *R.A.*, the charges at issue came from just one *Fortnite* player account. Here, the charges to Mrs. White's credit card originated within four different *Fortnite* accounts, and Plaintiffs deny that C.W. himself made many of these charges. *See* Dkt. No. 60. Put simply, the judicial "declaration" Plaintiffs now appear to want is that every in-game transaction should be refundable for any reason, even by adults like Mrs. White, and even long after the player has used and enjoyed the benefits of his or her purchase. Even were that claim tenable (which it is not), Plaintiffs have not explained why C.W. has standing to assert it, given that his "own money" transactions were actually made using gift cards purchased by others from Apple and Sony (*see infra* Section A.1), and Plaintiffs' only purchases from Epic Games were charged to Rebecca White's credit card and did not involve C.W.'s money at all (*see infra* Section A.2).

### 1. Plaintiffs' Disaffirmation Claim Against Epic Games Fails Because It Is Premised on C.W.'s Transactions Using Apple and Sony Gift Cards.

Plaintiffs cannot disaffirm to Epic Games transactions that C.W. engaged in with other companies. C.W. now alleges he purchased V-Bucks not from Epic Games using his "own money," but from Apple and Sony using those companies' iTunes- and PlayStation-store-specific (non-cash) gift cards. Indeed, what C.W. received as "gifts on social occasions" was not cash, or even cash-equivalents, but credits, purchased by others, redeemable only on those third parties' sites. After using his gift cards to acquire V-Bucks from those other companies, C.W. used the V-Bucks in his *Fortnite* player account to acquire the in-game benefits he wanted. If C.W. wishes to disaffirm his gift card transactions and seek the return by Apple and Sony of the gift card credits he used to purchase the V-Bucks, he must present his claims to Apple and Sony, not the company he has sued (Epic Games). Simply put, C.W. cannot recover cash from Epic Games through the act of disaffirmation to Epic Games because he never gave cash to Epic Games at all.

Plaintiffs' brief attempts to avoid these arguments. Instead, Plaintiffs contend that C.W. was "the holder of the[se] gift card[s]" (which is not dispute) and thus "has rights of redeeming the same." Opp. at 9. C.W.'s "rights of redeeming," however, were with Apple and Sony (not with Epic Games).[1] Plaintiffs then falsely state that Epic Games "does not dispute that the gift cards function properly and allow its users (mainly minors) to make purchases on *its system* using these gift cards." Opp. at 9 (emphasis added). Not only does Epic Games "dispute" that Apple or Sony gift cards can be used to purchase anything from Epic Games' "system," but Plaintiffs cannot allege a single fact in support of that statement to have it rise to the level of a "dispute." Plaintiffs do not and cannot allege that iTunes or PlayStation gift cards can be used anywhere other than on the "systems" of the cards' issuers, Apple and Sony.

A simple analogy makes the point. Many merchants sell their wares both at their own stores and also at department stores, such as Macy's. If one receives a Macy's gift card, one can purchase items sold at Macy's by any number of merchants. That same recipient, however, cannot use the

---

[1] Plaintiffs are incorrect, moreover, that California Civil Code § 1749.5(b) would allow C.W. to exchange a gift card for cash even with the issuer of the card. This statute provides that a gift card "is redeemable in cash for its cash value, *or subject to replacement with a new gift certificate at no cost to the purchaser or holder*." *Id.* (emphasis added).

Macy's gift card to buy the same items directly from the merchant's own store, nor can he attempt to "disaffirm" a Macy's purchase anywhere but Macy's.

*White v. Hollister Co.*, No. B239119, 2013 WL 30361 (Cal. Ct. App. Jan. 3, 2013), is not to the contrary. *White* was a lawsuit against a retailer based on $25 gift cards that Hollister circulated as a holiday promotion. The retailer printed no expiration date on the cards but communicated the expiration date in other media. A gift card holder who did not redeem her card prior to this expiration date sued pursuant to Cal. Civ. Code § 1749.5, which requires expiration dates to be printed on cards in at least 10-point type. The Court of Appeal held that only plaintiffs who did not see defendant's other expiration date communications had a valid claim, while those who learned of the expiration from other sources did not. *See id.* at *10. The case does not support Plaintiffs' argument that the holder of an iTunes or PlayStation gift card can sue a different company (Epic Games) to disaffirm a transaction with those other companies. Opp. at 9.

Plaintiffs' only other argument in support of C.W.'s claim that he can sue Epic Games to disaffirm his transactions with Apple and Sony is to characterize these third parties as "payment vendors" that "merely facilitate the financial transactions on behalf of" Epic Games. Opp. at 8. They state no factual support for this characterization, and there is none. As for purported legal support, Plaintiffs cite *McNamara v. Voltage Pay Inc.*, No. 2:15-cv-2177-JAD-GWF, 2017 WL 3709057 (D. Nev. Aug. 28, 2017), which does not help them. In *McNamara*, the Federal Trade Commission discovered that a group of companies was "stealing money from consumers through micro-transactions: making illicit charges on accounts that were too small for consumers to notice." *Id.* at *1. A court-appointed receiver for those adjudged criminal enterprises sued "one of the online payment-processing companies that the entities used to carry out their scheme, Voltage Pay Inc." *Id.* The court dismissed fraudulent transfer claims against Voltage because "the Receiver Entities paid Voltage in an arms-length transaction for payment processing services." *Id.* The persons whose monies allegedly were stolen in micro-transactions did not have any relationship with Voltage. Here, by contrast, C.W. redeemed Apple and Sony gift cards on those companies' marketplaces. Contrary to Plaintiffs' assertion, Apple and Sony *were* "the contracting part[ies] with" C.W. Opp. at 10. Plaintiffs thus have no grounds to argue that the "source of the gift cards

1  . . . is of no significance." *Id.* at 9.  In fact, the "source" is crucial and determines the contracting
2  party to whom disaffirmation claims must be presented.  C.W. cannot invoke statutory
3  disaffirmation rights against Epic Games for his purchases from Apple and Sony.

4  Because C.W. no longer contends that he purchased anything from Epic Games with his
5  "own money," the Court's prior rulings in Dkt. No. 54, which were based on those "own money"
6  allegations, no longer apply.  Thus, Epic Games is not asking the Court to "reverse itself," as
7  Plaintiffs incorrectly suggest.  Opp. at 1.  The Court has not yet determined whether C.W. has a
8  viable claim for a declaratory judgment or a dependent UCL "unlawful" prong claim against Epic
9  Games based on transactions between C.W. and third parties.  Epic Games now requests that the
10 Court hold C.W. has no such claims.

### 2. C.W. Cannot Disaffirm In-Game Purchases of V-Bucks Charged to His Parent's Credit Accounts.

13 Plaintiffs' prior Complaint also did not reference payments to Epic Games from Rebecca
14 White's credit accounts.  Plaintiffs did not confess to the existence of these payments in the FAC
15 until discovery forced them to do so.  The Court thus has had no occasion to judge whether C.W.
16 can seek a declaratory judgment as to his purported right to disaffirm purchases he made on his
17 mother's credit card with his mother's authorization.

18 In the FAC, for the first time, Plaintiffs allege that when C.W. "used . . . [a] Sony PlayStation
19 4, and Windows 10 Personal Computer" to play *Fortnite*, FAC ¶ 34, "[t]he financial information
20 used to make the in-App Purchases [*i.e.,* his mother's credit card information] was available on the
21 Minor's gaming platform[s]."  Opp. at 6-7, *citing* FAC ¶ 41 ("Plaintiff C.W. has made V-Bucks
22 purchases through his parent's credit cards and debit cards that were available from his gaming
23 platforms.").  Plaintiffs' brief, however, does not address how Mrs. White's "financial information"
24 came to be "available" for C.W.'s authorized use on his devices.  As Epic Games pointed out in its
25 opening brief, that credit card number "did not find its way into C.W.'s gaming platforms on its
26 own."  Dkt. No. 59, at 9.  Someone within the Whites' residence had to enter that credit card
27 number, manually, into *each* of the four *Fortnite* accounts from which charges were made, and
28 store those numbers in each account for use in future transactions.

Plaintiffs tacitly admit that Mrs. White entered her credit card number into C.W.'s account(s) and then did not monitor C.W.'s usage of it. Plaintiffs concede that "[t]he credit card . . . information . . . was not stolen and was not **improperly** used by [C.W.]." Opp. at 7 (emphasis added); *see also id.* at 8 (C.W. did not "input steal or improperly use his parent's credit card information"). By intentionally storing the credit card in C.W.'s account for his use, Mrs. White authorized C.W. to make "one click purchases." FAC ¶ 51.[2] Mrs. White may have "ignore[d] these expenses as onesie-twosie expenses at the early stages of using Fortnite," *id.* ¶ 56, but that does not remove her responsibility for transactions she authorized her son to make with *her* money, not his. Epic Games demonstrated in its opening brief that a minor cannot disaffirm transactions made on a parent's credit card account as an authorized "agent," *see* Dkt. No. 59, Motion at 8-9.

Plaintiffs then have attempted to muddy the waters by advising the Court that many of the charges to Mrs. White's credit cards were supposedly made by "friends" of C.W.'s who played *Fortnite* at the Whites' residence using **these friends'** *Fortnite* accounts, not the one *Fortnite* account Plaintiffs have admitted C.W. used. *See* Dkt. No. 60 at 2. As a matter of Mrs. White's responsibility for the charges, this does not matter; she had to enter the credit card number manually into each *Fortnite* account that charged to it. Just as importantly, if these transactions truly were made by C.W.'s friends, and not C.W., that is the end of the matter: Plaintiffs cite no support, and none exists, for the proposition that C.W. has a right disaffirm purchases he did not make.

Nor do Plaintiffs have any kind of misrepresentation claim with regard to Mrs. White's decision to enter or store a credit card number in four different player accounts. Neither Plaintiffs' FAC nor their brief identifies any misstatements or omissions that Epic Games made to C.W. or Mrs. White with respect to that decision. Mrs. White does not allege that Epic Games required her to do this (it did not, and no purchases of any kind are required to play *Fortnite*), and she admits that she could have better supervised her son's use of her credit card accounts and could have better monitored her monthly credit card statements. *See* FAC ¶¶ 44, 52, 60.

---

[2] Plaintiffs' brief attempts to characterize one-click purchases, which Mrs. White's storage of her credit card information in C.W.'s account authorized him to make, as "Defendant's *Fortnite* software access[ing] without permission the financial information" that Mrs. White stored. Opp. at 7. That description is untenable.

Significantly, Plaintiffs' brief has no response at all to the core arguments in Epic Games' opening brief. Not only does C.W.'s status as an authorized "agent" making purchases on his mother's credit card preclude him from disaffirming his purchases, but Mrs. White ratified all these purchases when she paid her credit card bills, apparently without complaint. Plaintiffs' brief makes the bare assertion that C.W. was not "an agent acting on behalf of his parent," Opp. at 7, but does not back up that statement with any factual or legal support.[3]

Epic Games' opening brief cited *Grube v. Amazon.com, Inc.*, No. 16-cv-126-LM, 2017 WL 3917602 (D.N.H. Sept. 6, 2017), which held that Amazon had every right to assume that when someone entered a credit card number and made a purchase, that person had authorization to use the credit card. Plaintiffs' brief attempts to distinguish *Grube* by contending that Amazon "offers parental control settings and the ability to disable all in-App purchases." Opp. at 7. Plaintiffs, however, allege *nothing* about Epic Games' parental controls or what Mrs. White saw when she entered her credit card number into C.W.'s *Fortnite* account. Plaintiffs allege that Epic Games "makes in-App purchases easy one-click requests," FAC ¶ 37, but they fail to acknowledge that Mrs. White chose to enter her credit card information, chose to store that credit card number for her son's and his friends' "one-click" use, chose to take no action to restrict her son's use of her credit card even after she saw her son's "onesie-twosie expenses at the early stages of using Fortnite," and chose not to monitor her credit card statements thereafter. *Id.* ¶ 56.

Plaintiffs try to support Mrs. White's disclaimer of responsibility for her "lack of monitoring of [her] financial account statements," Opp. at 8, by citing to *Ileto v. Glock Inc.*, 349 F.3d 1191 (9th

---

[3] Separate from Epic Games' agency arguments, Epic Games respectfully requests that the Court revisit its prior ruling that Cal. Fam. Code § 6710 permits disaffirmation of entertainment purchases after the minor has enjoyed the entertainment. That ruling has sweeping implications for all manner of entertainment purchases that minors make every day, online and off. The California Supreme Court has not issued any decisions on point, and Plaintiffs have cited nothing to suggest that the California Legislature intended disaffirmation to be so broadly applicable. Plaintiffs' attempts to distinguish *Morrow v. Norwegian Cruise Line Ltd.*, 262 F. Supp. 2d 474 (M.D. Pa. 2002), and *Paster v. Putney Student Travel, Inc.*, No. CV 99-2062 RSWL, 1999 WL 1074120 (C.D. Cal. June 9, 1999) are unavailing because C.W. "accepted the benefits" of his purchases in the same manner that the plaintiffs in those cases did. Plaintiffs' argument that "Defendant creates the software once and sells the same to thousands of users including minors without incurring any additional cost," Opp. at 5, could be said equally about admission to an already-built amusement park or a ticket to an already-produced movie. If the Court finds that entertainment purchases are not subject to disaffirmation, that ruling alone would be dispositive.

Cir. 2003). That citation is puzzling. *Ileto* was a negligence and public nuisance lawsuit by shooting victims against gun manufacturers, distributors, and dealers. Plaintiffs refer the Court to the part of that decision in which the Ninth Circuit considered whether California's public nuisance law allowed the plaintiffs to sue Glock without alleging "that Glock had control over the gun when plaintiffs were injured." *Id.* at 1212. It is unclear why Plaintiffs believe *Ileto* is relevant to their assertion that C.W. can disaffirm transactions he made on his parent's credit card account with his parent's authorization, after his parent failed to monitor his authorized usage of that account and ratified his usage by paying the bill without dispute.

Ultimately, Plaintiffs' revised allegations in the FAC preclude their claim for a declaratory judgment or under the UCL "unlawful" prong. Although the Court left those claims intact when it ruled on the prior Complaint, that was before Plaintiffs retracted the material facts underlying them. The FAC confirmed that C.W. **did not** use "his own money" and instead only (1) redeemed third-party gift cards on third-party marketplaces, and (2) acted with his parent's authorization to charge purchases to Mrs. White's credit card, which charges she paid without dispute. In either scenario, C.W. cannot disaffirm such purchases, and the Court should dismiss Plaintiffs' claims.

Even were the Court to find—as it should not—that Plaintiffs still may pursue a declaratory judgment or UCL "unlawful" claim with regard to C.W.'s desire to disaffirm these transactions, the Court should not resurrect the other claims it dismissed from Plaintiffs' original Complaint. As discussed below, Plaintiffs have not cured any of the deficiencies the Court noted when it did so.

**B.     The Court Should Again Dismiss Plaintiffs' Fraud-Based Claims.**

Beyond Plaintiffs' attempt to claim that C.W. can disaffirm the three categories of in-game transactions discussed above, their FAC tries to reassert fraud claims arising from the availability of in-game enhancements for purchase and Epic Games' stated refund policies. The Court properly dismissed those claims from Plaintiffs' original Complaint because Plaintiffs neither did nor could identify any misstatements or omissions by Epic Games. The same is true of the FAC.

**1.     Digital In-Game Items Are Not CLRA-Defined "Goods" or "Services."**

Plaintiffs' brief does nothing to change the fact that so-called "virtual currency" that can be exchanged for other in-game items, like V-Bucks, falls outside the CLRA, therefore barring

FAEGRE DRINKER BIDDLE
& REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

EPIC GAMES, INC.'S REPLY IN SUPPORT OF
MOTION TO DISMISS AMENDED COMPLAINT            - 11 -            CASE NO. 4:19-CV-3629

Plaintiffs' claim. In ruling on Epic Games' initial Motion to Dismiss, the Court held that V-Bucks, like the Facebook "credits" at issue in *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F. Supp. 2d 989, 996 (N.D. Cal. 2012), are not "tangible chattel"—they "exist only as an indicia of credit extended to a *Fortnite* player"—and therefore are "not covered by the CLRA." Dkt. No. 54 at 20-21. This continues to be true. Plaintiffs contend, as they did before, that the *Fortnite* software itself is a "service," like the admission to a theme park at issue in *Anderson v. Seaworld Parks and Ent'mt, Inc.*, No. 15-cv-2172-JSW, 2016 WL 8929295, at *10 (N.D. Cal. Nov. 7, 2016). Unlike that plaintiff who paid for a ticket, however, C.W. did not pay for the *Fortnite* software and is not seeking to disaffirm a contract to pay for it. Plaintiffs are, instead, suing only over C.W.'s use of V-Bucks within the game to enhance his enjoyment of it. Nothing about that has changed since the Court ruled on the sufficiency of Plaintiffs' prior Complaint and, properly, dismissed Plaintiffs' claims under the CLRA.

### 2. Plaintiffs' UCL and Negligent Misrepresentation Claims Fail Because Epic Games Does Not "Mislead" Players About the Ability to Disaffirm Contracts.

The Court also previously dismissed Plaintiffs' fraud-based claims because they did not allege either any false statement that C.W. read and relied upon to his detriment, or a material omission from a statement he read. *See* Dkt. No. 54 at 22. In its ruling, the Court likened Plaintiffs' claims to those in *T.K.*, where the plaintiff alleged claims based on terms of service without alleging "that plaintiff actually read the relevant terms of service or relied on them." Dkt. No. 54 at 22-23. Not only did Plaintiffs fail in their FAC to identify any new statements or omissions pertaining to refunds or disaffirmation that C.W. supposedly relied upon, but Plaintiffs now have alleged definitively that (1) C.W. "does not recollect seeing, reading, or agreeing to the EULA or any amended EULAs," FAC ¶ 38; (2) C.W. did not "look for refund policy options at the time of purchase," *id.* ¶ 43; and (3) it was C.W.'s counsel who first advised him, after C.W. retained those counsel, "of a minor's right to disaffirm and get refunds on any and all in-App purchases without any restrictions." *Id.* ¶ 45. These affirmative statements of ignorance about both Epic Games' published refund policies and a minor's statutory disaffirmation rights flatly preclude C.W. from complaining that Epic Games somehow "misled" him about an inability to exercise those rights.

More fundamentally, Plaintiffs continue to conflate a <u>refund policy</u> applicable to all consumers with contractual <u>disaffirmation</u>, which is available only to minors. Plaintiffs argue that Epic Games "does not allow for a general refund, as many items remain non-refundable and outside of Defendant's refund policy." Opp. at 3. That does not mean, however, that Epic Games would refuse or ever has refused a minor's lawful request to disaffirm a contract. It has never even had a meaningful chance to address C.W.'s own request. Plaintiffs cite no authority, and none exists, to support their argument that describing an item (*i.e.,*, an in-game "Battle Pass") as "non-refundable" to all users somehow could have misled a minor into believing that he cannot exercise rights under Cal. Fam. Code § 6710. Such a rule would render every "non-refundable" description unlawful in California because it would be capable of "misleading" minors. Epic Games is, further, unaware of, nor do Plaintiffs cite, any authority standing for the proposition that a vendor must affirmatively disclose minors' disaffirmation rights before consummating a transaction. Indeed, imposition of the standard Plaintiffs ask the Court to adopt—requiring affirmative disclosure of this and other rights the law may give a minor—is untenable. If this were, in fact, required, surely the California legislature would have said so, rather than leaving it to inference.

This same problem requires dismissal, again, of Plaintiffs' negligent misrepresentation claim. As before, Plaintiffs do not "allege sufficiently that [Epic Games] made a misrepresentation or that [C.W.] justifiably relied on [one]." Dkt. No. 54 at 26. Plaintiffs' brief points to "pop-ups that have very small fonts on refund restrictions," Opp. at 14, *citing* FAC ¶¶ 50, 62, but the FAC does not claim that C.W. himself ever saw or relied upon any "pop-ups." In the absence of pleading any actionable misrepresentation or justifiable reliance, Plaintiffs' claim again fails.

Plaintiffs' UCL claims under the "unfair" and "fraudulent" prongs fails for similar reasons.[4] As for the "unfair" prong, the FAC confirms that *Fortnite* may be played, and V-Bucks may be earned in-game, for free. Plaintiffs still fail to identify any facts showing that Epic Games "induces

---

[4] As noted *supra* in Section A.1, Plaintiffs' UCL claim under the "unlawful" prong is predicated on the alleged violation of the California Family Code (i.e., C.W.'s alleged inability to disaffirm) and fails for the same reasons as his claim for Declaratory Relief. Now that Plaintiffs have confirmed (1) C.W. did not use "his own money" in any transaction with Epic Games and (2) Plaintiffs never gave Epic Games any pre-suit opportunity to consider a disaffirmation request, there is no basis for the Court to find that Epic Games has violated the Family Code.

1  minors to play for long hours and even during night." FAC ¶ 55. They have pleaded nothing
2  "unfair." As for the "fraudulent" prong, Plaintiffs fail to allege any false or misleading statements
3  on which to base their claim. Plaintiffs' brief simply repeats the FAC's conclusory claims that
4  C.W. "was induced" and "was misled." Opp. at 15. The *Fortnite* user agreement, however, does
5  **not** misrepresent minors' disaffirmation rights and instead makes clear that purchases are
6  refundable if required by law. *See* Dkt. No. 21-1 at 11. Moreover, Plaintiffs admit that they never
7  read the EULA, *see* FAC ¶ 38, which renders impossible any claim of causation or reliance.

8  **C.     Plaintiffs Fail to Adequately Plead a Breach of the Implied Duty of Good Faith.**

9  The Court dismissed Plaintiffs' breach of duty of good faith and fair dealing claim from the
10 prior Complaint because, as was the case in *T.K.*, the *Fortnite* EULA "did not promise [C.W.] the
11 right to disaffirm." Dkt. No. 54 at 24. The *T.K.* plaintiff could not sue for breach of the duty even
12 after the defendant in that case refused her attempt to disaffirm. Here, Epic Games' EULA said
13 nothing explicitly about disaffirmation but made clear that Epic Games would provide refunds
14 whenever applicable law requires it to do so. The EULA also made expressly clear that Epic Games
15 "may engage in actions that may impact the perceived value or purchase price, if applicable, of
16 Game Currency and Content at any time, except as prohibited by applicable law" (*see* Dkt. No. 21-
17 1 at 11), including the release of new content, game updates or in-game item updates. Plaintiffs
18 now claim that Epic Games has acted in an "arbitrary or unreasonable" fashion by exercising its
19 contractual right to do this. Opp. at 13. It is axiomatic, however, that "the scope of conduct
20 prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the
21 contract." *Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 373
22 (1992). It follows, therefore, that the contractually authorized conduct at issue cannot form the
23 basis of a claim for breach of the duty of good faith and fair dealing. This would frustrate the
24 purpose of the express terms of the contract. For that reason alone, Plaintiffs' claim fails.

25 Plaintiffs separately contend that they have asserted a "tortious bad-faith" claim separate
26 from their "contractual bad-faith claim." Opp. at 13. New ¶ 108 in Plaintiffs' FAC alleges that
27 Epic Games constantly introduced new enhancements to *Fortnite*, but Plaintiffs have never
28 explained why this is actionable or how Epic Games supposedly led C.W. to believe that it would

FAEGRE DRINKER BIDDLE
& REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

EPIC GAMES, INC.'S REPLY IN SUPPORT OF
MOTION TO DISMISS AMENDED COMPLAINT — - 14 - — CASE NO. 4:19-CV-3629

**not** introduce new in-game items for purchase. The EULA made clear that Epic Games could "engage in actions that may impact the perceived value" of V-Bucks and game content. Dkt. No. 21-1 at 11. As a result, Plaintiffs fail to articulate any viable theory of breach. Therefore, for the same reasons set forth with regard to Plaintiffs' contractual bad-faith claim, this claim fails.

### D. Plaintiffs' Unjust Enrichment Claim Fails as a Matter of Law.

Finally, Plaintiffs' brief does nothing to resurrect the unjust enrichment claim this Court previously dismissed. It merely parrots the FAC's insufficient allegations. *See* Opp. at 15-16. As stated in the Court's order dismissing Plaintiffs' initial complaint, Plaintiffs did "not allege[] that [they were] misled or that [Epic Games] breached any express or implied covenant as it relates to" refunds for in-game purchases. Dkt. No. 54 at 30. Nothing in their Opposition alters the fact that Plaintiffs still do not plead with specificity that Epic Games made any actionable misrepresentation or that C.W. relied on any alleged misrepresentation, much less how C.W. was misled. Plaintiffs' unjust enrichment claim should be dismissed again, with prejudice.

### CONCLUSION

For each of the foregoing reasons, as well as those set forth in Epic Games' Motion to Dismiss, Epic Games respectfully requests that the Court dismiss each of Plaintiffs' claims alleged in the FAC without further leave to amend.

Dated: April 23, 2020

FAEGRE DRINKER BIDDLE & REATH LLP

By: */s/ Jeffrey S. Jacobson*
Jeffrey S. Jacobson (*pro hac vice*)
Matthew J. Adler
Ryan M. Salzman

Attorneys for Defendant
EPIC GAMES, INC.